IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MARCUS RAY SMITH, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 20-CV-148-RAW-DES |
| ) | |
| WILLIAM RANKINS,[1] ) | |
| ) | |
| Respondent. ) | |

**OPINION AND ORDER**

Petitioner Marcus Ray Smith, a state prisoner appearing *pro se*,[2] brings this action pursuant to 28 U.S.C. § 2254, seeking federal habeas relief from the judgment and sentence entered against him in the District Court of Bryan County, Case No. CF-2015-843. Dkts. 1, 4. Respondent William Rankins has filed a response (Dkt. 9) in opposition to the petition, as well as the state-court record (Dkt. 10). Having considered the parties' arguments and the relevant record, the Court denies the petition.

I. BACKGROUND

This matter arises from a car chase between Smith and multiple police officers that

---

[1] Smith presently is incarcerated at the Oklahoma State Reformatory, in Granite, Oklahoma. The Court therefore substitutes the Oklahoma State Reformatory's current warden, William Rankins, in place of Jimmy Martin, as party respondent. *See* Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts. The Clerk of Court shall note this substitution on the record.

[2] Because Smith appears without counsel, the Court must liberally construe his pleadings. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the rule of liberal construction neither requires nor permits the Court to act as an advocate on his behalf by crafting legal arguments or scouring the record for facts to support his claims. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

occurred in Bryan County, Oklahoma, in December 2015.  Dkt. 1, at 8.[3]  Smith was tried and convicted in a non-jury trial of one count of driving a motor vehicle while under the influence of drugs, causing great bodily injury (Count 1), one count of felony eluding (Count 2), one count of running a roadblock (Count 3), and four counts of assault with a dangerous weapon (Counts 5, 6, 7, and 8).  Dkt. 10-4, at 78.  He received ten-year terms of imprisonment on Counts 1 through 3, and thirty-year terms of imprisonment on Counts 5 through 8, with the last five years suspended and with all terms to be served concurrently.  *Id.* at 79.

Smith directly appealed his conviction and sentence to the Oklahoma Court of Criminal Appeals (OCCA), raising three grounds for relief: (1) "the multiple punishments for one course of criminal conduct violated 21 O.S. § 11"; (2) "the State presented insufficient evidence to convict on Counts V-VIII"; and (3) "Smith received ineffective assistance of counsel when counsel failed to preserve his double punishment claim."  Dkt. 1, at 2.  The OCCA affirmed the judgment and sentence in *Smith v. State*, No. F-2018-15 (Okla. Crim. App. May 16, 2019) (Dkt. 9-4), and Smith now seeks federal habeas review of his claims.

II.   LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and internal quotation marks omitted).  When a claim has been "adjudicated on the merits in State court proceedings," federal habeas relief may be granted under the AEDPA only if the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal

---

[3] The Court's citations refer to the CM/ECF header pagination.

law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision." *Dodd v. Trammell*, 753 F.3d 971, 982 (10th Cir. 2013) (alteration and internal quotation marks omitted). A state-court decision is "contrary to" clearly established federal law if the conclusion is "opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Id.* (alterations and internal quotation marks omitted). A state-court decision is an "unreasonable application" of clearly established federal law if the "state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* (alteration and internal quotation marks omitted). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico*, 559 U.S. at 773 (citations and internal quotation marks omitted) (emphasis in original). Further, a state-court's "determination of a factual issue . . . shall be presumed to be correct," unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

III. DISCUSSION

A. Ground One: Multiple Punishment for One Course of Criminal Conduct

In his first claim for relief, Smith contents that his convictions violate Okla. Stat. tit. 21, §

3

11, which "prohibits prosecution and punishment for more than one crime" if the crimes "arise out of one act." *Irwin v. State*, 424 P.3d 675, 676 (Okla. Crim. App. 2018). Smith contends that his convictions for running a roadblock and assault with a dangerous weapon arose out of the single act constituting felony eluding. Dkt. 1, at 19-22. He argues that, pursuant to section 11, he "is guilty of the single act of eluding" and that the "additional crimes" of running a roadblock and assault with a dangerous weapon should "be reversed." *Id.* at 21-22. Smith raised this claim on direct appeal, and the OCCA denied relief. Dkt. 9-4, at 2-6.

Respondent contends that Smith's claim is not cognizable under 28 U.S.C. § 2254 because it alleges violation of a state law, rather than "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Dkt. 9, at 15-19. Smith does not claim that his convictions violate the Double Jeopardy Clause of the United States Constitution. Smith argues only that "his convictions violate Oklahoma's statutory prohibition against double punishment." *El Mansouri v. Jones*, 235 F. App'x 713, 717 (10th Cir. 2007).[4] Thus, his claim "involves purely a matter of state law," and "cannot serve as grounds for federal habeas relief." *Id.*; *see Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Accordingly, Smith has not shown entitlement to habeas relief on this claim.

B. Ground Two: Sufficiency of the Evidence

Smith was charged and convicted on four counts of assault with a dangerous weapon, in violation of Okla. Stat. tit. 21, § 645, for assaulting five individuals—Deputy John Haislip, Deputy

---

[4] The Court cites all unpublished decisions herein as persuasive authority. Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

Jason Bannowsky, Trooper B.J. Keeling, Micha Current, and Tristen Allen—with his vehicle during the December 2015 car chase. Dkt. 10-4, at 49-50. Smith contends, as he did before the OCCA, that the State presented insufficient evidence to support these convictions. Dkt. 1, at 23-26.

When reviewing the sufficiency of the evidence supporting a state criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under Oklahoma law, assault with a dangerous weapon includes the following elements: (1) an assault, (2) upon another person, (3) with a dangerous weapon, (4) without justifiable or excusable cause, (5) with intent to do bodily harm. *See* Okla. Unif. Jury Instr. CR 4-12; Okla. Stat. tit. 21, § 645. Smith concedes that the first four elements were likely met but contends that no evidence was presented at trial to support the fifth element: intent to do bodily harm. Dkt. 1, at 24.

On direct appeal, the State argued that "'defendant's intent can be inferred from circumstantial evidence.'" Dkt. 9-2, at 31 (quoting *Romano v. State*, 909 P.2d 92, 119 (Okla. Crim. App. 1995)). The State then pointed to testimony that Deputy Haislip, Deputy Bannowsky, Trooper Keeling, and Micha Current had to take evasive action to avoid a collision with Smith's vehicle. *Id.* at 32-34. The State also referenced video evidence taken from an officer's dashcam:

> Trooper McCutcheon testified while he was driving [east] on Highway 70 attempting to catch defendant, he saw other police units driving west on Highway 70, approaching the pursuit from the opposite direction. Trooper McCutcheon saw defendant's vehicle steer towards the emergency lights of the law enforcement vehicles and towards civilian vehicles that were also traveling in the westbound lane. Trooper McCutcheon's dash camera video footage shows defendant maintaining his vehicle in the center and eastbound lanes of Highway 70 until he encounters law enforcement and civilian vehicles driving in the opposite direction in the westbound lanes at which point he drives his vehicle directly towards them and then returns to either the center or eastbound lanes. The video also shows there

5

> was ample room on the highway for defendant to drive on the correct side of the highway without driving directly towards oncoming vehicles.

*Id.* at 34 (citations omitted). The OCCA rejected Smith's claim of insufficient evidence, holding:

> Evidence is sufficient to support a conviction if, viewing the evidence and all reasonable inferences from it in the light most favorable to the State, any rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Coddington v. State*, 2006 OK CR 34, ¶ 70, 142 P.3d 437, 456; *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-04.
>
> Assault with a dangerous weapon requires an assault upon another person, with a dangerous weapon, without justifiable or excusable cause, with intent to do bodily harm. 21 O.S.2011, § 645; OUJI-CR 2d, 4-12. The evidence showed that Appellant steered his vehicle toward several oncoming cars in a manner sufficient to show that he intended to do bodily harm.
>
> We find that any rational trier of fact could find beyond a reasonable doubt that Appellant committed multiple acts of assault with a dangerous weapon, i.e., his vehicle, based on the evidence presented at trial. *See Logsdon v. State*, 2010 OK CR 7, ¶ 5, 231 P.3d 1156, 1161; *Spuehler*, 1985 OK CR 132, ¶ 7, 709 P.2d at 203-04. Proposition Two is denied.

Dkt. 9-4, at 6-7.

"A sufficiency-of-the-evidence challenge in a habeas petition presents a mixed question of fact and law," requiring the Court to determine "whether the facts are correct and whether the law was properly applied to the facts." *Hooks v. Workman*, 689 F.3d 1148, 1165 (10th Cir. 2012) (internal quotation marks omitted). Thus, the Court "appl[ies] both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiently of the evidence on habeas." *Id.* (quoting *Brown v. Sirmons*, 515 F.3d 1072, 1089 (10th Cir. 2008)). Under § 2254(d)(1), the Court "ask[s] whether the OCCA correctly identified the governing legal principle from *Jackson* and reasonably applied it to the facts of [Smith's] case." *Id.* at 1167. Under § 2254(d)(2), the Court asks whether the state court "plainly and materially misstated the record" or whether the petitioner has "show[n] that reasonable minds could not disagree that the finding was in error." *Smith v. Sharp*, 935 F.3d 1064, 1072 (10th Cir. 2019) (internal quotation marks omitted).

6

1. *Relevant Evidence*

The portion of the car chase from which the four counts of assault with a dangerous weapon arise took place on a five-lane highway, with two eastbound lanes separated from two westbound lanes by a center turn lane. Dkt. 10-2, at 99, 106-07, 116, 123-24. Smith was driving a red Pontiac Trans Am with his girlfriend at the time, Jordyn Garber, as his passenger. *Id.* at 8, 163. The car chase took place after dark, around 9 o'clock. *Id.* at 11. At trial, Deputy John Haislip, Deputy Jason Bannowsky, Trooper B.J. Keeling, and civilian Micha Current each testified regarding his experience.[5] The state district judge also heard testimony from Trooper David McCutcheon, who participated in the chase, as well as Smith and Jordyn Garber.

   a. Testimony of Trooper David McCutcheon

Trooper McCutcheon testified that he witnessed Smith make an illegal turn onto the highway, ran Smith's tag information, and discovered that Smith's tag had been expired for several years. *Id.* at 6-10. When McCutcheon attempted a traffic stop, Smith accelerated, initiating the pursuit. *Id.* at 12. McCutcheon reached speeds up to 155 miles per hour as he tried to catch up to Smith. *Id.* at 14. Smith made a U-turn, turned off the highway onto another road, then made another U-turn such that he was traveling back toward the highway. *Id.* at 15. McCutcheon attempted to set up a roadblock, but Smith "swerved onto [a] ditch . . . to avoid [McCutcheon's] vehicle." *Id.* at 16. Smith returned to the highway and traveled east, and other officers joined the pursuit. *Id.* at 16-17. McCutcheon testified that Smith, at that point, was "all the way over on the shoulder of the westbound traffic," then moved back into the eastbound lanes. *Id.* at 17-18. McCutcheon testified that he then observed other police units in the westbound lanes approaching

---

[5] Tristen Allen, the fifth individual Smith was convicted of assaulting with his vehicle, was Micha Current's passenger and did not testify at Smith's trial. *Id.* at 113.

the pursuit and that "the Trans Am was actually steering towards the emergency lights" of the vehicles. *Id.* at 18. McCutcheon stated that throughout the pursuit "there [were] probably four or five police units that the vehicle swerved at" and "probably about that same number of actual civilian vehicles . . . that the vehicle was swerving at." *Id.* at 19.

McCutcheon testified that he was in contact with Trooper Keeling, who was approaching from the west in the left westbound lane as the pursuit was heading east. McCutcheon testified, "[A]s we approached to meet [Keeling], the . . . Trans Am actually swerved towards Trooper Keeling's vehicle." *Id.* at 20. Keeling, however, was able to "get out of the way" and "avoid [an] accident." *Id.* at 20-21. McCutcheon was eventually able to end the pursuit by impacting Smith's rear bumper. *Id.* at 21-25.

b.  Testimony of Deputy John Haislip

Deputy Haislip testified that he was headed westbound on the highway in a Chevy truck when he saw Smith in a "little red car" cross over into his lane from the eastbound lanes. *Id.* at 96-98. He stated, "[A]s the headlights came towards me, I started kind of pulling to my right, because I could see all the red and blue lights behind it. And I started pulling over toward the shoulder, so that I could turn around. The vehicle crossed the lane of traffic, over into my lane of traffic, causing me to go off the side of the road, to be able to flip around to get to them." *Id.* at 98. When asked whether he believed he would have been impacted by Smith's car had he not taken evasive action, Deputy Haislip stated, "I think I got over far enough, prior to, to be able to evade it. Had I stayed in the lane I was in, yes, I would have." *Id.* at 100.

During cross-examination, Deputy Haislip was questioned regarding Smith's intent to cause bodily harm. He testified that he did not have any direct evidence that Smith was trying to hit him or his car. *Id.* at 102. When asked if, from his perception, Smith could have driven into

8

his car if he had wanted, Deputy Haislip responded, "I'm sure he could have, yes." *Id.*

### c. Testimony of Deputy Jason Bannowsky

Deputy Bannowsky testified that, while heading west on the highway, he saw "several lights and vehicles coming back to the east, towards [him]," including a red Trans Am, which was driving erratically at high speeds. *Id.* at 105-06. Deputy Bannowsky was traveling in the left westbound lane, when Smith, traveling east, came "into [Deputy Bannowsky's] lane of traffic, heading straight for [his] patrol vehicle." *Id.* at 106. Deputy Bannowsky stated that he "stopped in the middle of the highway, to avoid a collision" and that Smith "swerve[d] to his right to avoid [him]," "narrowly missing [him]." *Id.* at 105, 110. When asked on cross-examination whether it was "be just as plausible" Smith was "trying to get away from [him], as it would that [Smith] was trying to assault [him] with his car," Deputy Bannowsky responded that he would not speculate but agreed that Smith swerved and drove around him. *Id.* at 109-10.

### d. Testimony of Trooper B.J. Keeling

B.J. Keeling, who was a State Trooper with the Oklahoma Highway Patrol at the time of the incident, was traveling in the left westbound lane when Smith approached from the east. *Id.* at 121-24. Keeling testified that he "could see lights, and then [he] heard the other troopers telling [him] to move over" because Smith was in oncoming traffic. *Id.* at 124. Keeling stated, "At that time I moved to the right, and the car narrowly passed me in the fast lane; I swerved to the right." *Id.* at 124. Keeling testified that he "[j]ust barely" noticed Smith's vehicle coming toward him due to the rate of speed, and that he moved to the "slow lane, partially in the shoulder area" to "get out of [Smith's] way." *Id.* at 124-25. When questioned by the prosecution whether he believed there would have been a collision "had [Keeling] not taken evasive action, and had the vehicle continued on the course where [Keeling had seen] it," Keeling responded, "I believe so, with the

speed that it was traveling, I don't think I could have reacted in time to get out of its way." *Id.* at 125. When questioned by the defense whether he believed Smith was "trying to hit [him]," Keeling responded that he "can't put [him]self in [Smith's] mind," and that the only evidence of Smith's intention to hit him was the fact that Smith "was driving 130 mile[s] an hour in oncoming traffic while meeting people head-on." *Id.* at 159-60. Following Smith's arrest, Keeling asked Smith why he had turned into oncoming traffic. Keeling testified that Smith initially "said that he figured, [if] he went into oncoming traffic, that we would stop chasing him," and later stated that he was "just trying to look for a place to turn." *Id.* at 134, 155-57.

e. Testimony of Micha Current

Micha Current testified that he was heading westbound on the highway with his girlfriend Tristen Allen and his two brothers when he saw Smith heading eastbound. *Id.* at 113-14. Current was in the left westbound lane when Smith approached. *Id.* at 116. Current testified, "[T]hen all of a sudden this red car come up top of the hill, and then there's a bunch of cops, following. And then he veered over into the turn lane. I didn't know if he was just, you know, was going to come all the way over or not, so I just stayed where I was. And then he just come—he come past the turn lane, into my lane." *Id.* at 114. Current testified that it "[l]ooked like [Smith's vehicle] was coming right at [him]," that he "froze for a second," and then moved his vehicle into the right lane. *Id.* at 117-18 ("I moved off into the right lane, because he was coming this way, and then, he almost hit, and then I moved, and then he come back this way, and then I seen them all, still trailing him."). During cross-examination, Current agreed that he did not have any facts to suggest that Smith was trying to intentionally hit his car and that it was "fair to say the red car was swerving in and out of traffic" as it approached. *Id.* at 119-20. Current further testified that he did not recall whether Smith also took evasive action to avoid a collision. *Id.* at 120.

f.  Testimony of Jordyn Garber

Jordyn Garber, who was called to testify for the defense, was Smith's girlfriend at the time of the car chase and was in Smith's vehicle during the pursuit. *Id.* at 163-64. When questioned by the defense whether there were "any facts at all that make [her] think maybe [Smith] was trying to scare these people or trying to hurt them," she responded, "Oh, he definitely wasn't trying to hurt them, no, sir." *Id.* at 166. Garber similarly testified on cross-examination that she believed Smith was trying to turn to get away from the vehicles pursuing them, rather than trying to swerve at or hit cars. *Id.* at 171 ("I don't feel like he was swerving at cars. I felt like he was just trying to turn and get away."). The prosecution then questioned Garber regarding the previous evidence that Smith had swerved toward civilian and law enforcement vehicles. Garber responded, "I know he swerved away from them, too. He wasn't trying to hit nobody. He would never." *Id.* at 172.

g.  Testimony of Marcus Smith

Smith testified on his own behalf at trial. When asked why he had driven into oncoming traffic, Smith stated that he was "trying to get away" and was not trying to hurt or scare anyone by driving toward them. *Id.* at 189-90. On cross-examination, Smith was questioned regarding his actions toward Deputy Haislip, Deputy Bannowsky, and Trooper Keeling. Regarding Deputy Haislip, Smith testified, "I don't remember swerving toward no truck, no, ma'am. . . . I didn't swerve directly at anybody." *Id.* at 201-02. Regarding Deputy Bannowsky, Smith testified that he "might have" swerved toward him but that he did not remember the encounter. *Id.* at 202. When questioned regarding Trooper Keeling, Smith stated, "I was trying to get away. I wasn't trying to swerve to anybody, or harm anybody." *Id.* at 202-03. Smith added that he was "just driving out of control." *Id.* at 203.

h.  Dashcam Footage

The State presented video evidence at trial from the dashcams of Troopers David McCutcheon, Scott King, Robby Keeling, and B.J. Keeling.  Dkt. 10-2, at 3.  The footage depicts the voice of the primary unit reporting that Smith was traveling "in the opposite lane of traffic," "cutting into oncoming traffic," and "going straight into oncoming traffic."  State's Ex. 1, at 7:50-8:41.  Soon after, Smith's vehicle becomes visible in McCutcheon's dashcam and can be seen traveling at high speeds toward both police and civilian vehicles in the oncoming lanes.  *Id.* at 9:15-9:55.  Footage following Smith's arrest depicts Smith acknowledging to Trooper B.J. Keeling that he met oncoming cars head on because he "thought [the officers] would stop."  State's Ex. 4, at 43:48-43:59.  Smith then denied having any intention of hurting the occupants or trying to force oncoming cars to hit his pursuers, stating instead that he was trying to turn.  *Id.* at 46:00-46:25.

2.  *The Reasonability of the OCCA's Decision*

In adjudicating Smith's claim, the OCCA determined that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the element of intent to do bodily harm beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319; Dkt. 9-4, at 6-7.  The OCCA specifically determined that "[t]he evidence showed that [Smith] steered his vehicle toward several oncoming cars in a manner sufficient to show that he intended to do bodily harm."  Dkt. 9-4, at 6.  It is clear the OCCA reviewed Smith's challenge to the sufficiency of the evidence under the standard articulated in *Jackson*.  Accordingly, the OCCA's decision was not "contrary to" clearly established federal law.  28 U.S.C. § 2254 (d)(1).  The question under § 2254(d)(1) therefore "becomes whether the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard."  *Hooks*, 689 F.3d at 1166 (internal quotation marks omitted) (referring to this standard of review as "deference squared").

Similarly, there is no indication that the OCCA "plainly and materially misstated the record," so the inquiry under § 2254(d)(2) becomes whether Smith has "show[n] that reasonable minds could not disagree that the [factual] finding" regarding his intent "was in error." *Smith*, 935 F.3d at 1072 (internal quotation marks omitted).

In resolving these questions, the Court considers "not whether [it] believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Harrington v. Richter*, 562 U.S. 86, 101-03 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)), ("[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."); *Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.").

Assault with a dangerous weapon under Okla. Stat. tit. 21, § 645 requires the "[s]pecific 'intent to do bodily harm.'" *James v. State*, 599 P.2d 411, 412 (Okla. Crim. App. 1979). "The specific 'intent to do bodily harm' must be proved by either direct or circumstantial evidence which might infer intent from the act done and is a question of fact." *Oliver v. State*, 516 P.3d 699, 710-11 (Okla. Crim. App. 2022) (quoting *James*, 599 P.2d at 412). In *Wingfield v. Massie*, 122 F.3d 1329 (10th Cir. 1997), the United States Court of Appeals for the Tenth Circuit offered the following guideposts for assessing evidence of intent:

> First, a jury is permitted to draw inferences of subjective intent from a defendant's objective acts. Thus, even when a defendant, as here, denies having the requisite

13

> intent, a jury may disbelieve the defendant, if [his] words and acts in the light of all the circumstances make [his] explanation seem improbable. Second, a jury is permitted to find that a defendant intends those consequences which he announces a desire to accomplish.

*Wingfield*, 122 F.3d at 1333 (citations and internal quotation marks omitted).

The record contains no evidence that Smith expressed a desire to harm individuals in oncoming traffic. To the contrary, he asserted that his intent in moving his vehicle toward oncoming traffic was to get his pursuers to "stop chasing him," to find "a place to turn," and to "get away." Dkt. 10-2, at 134, 155-57, 203. He stated that he "wasn't trying to swerve to anybody, or harm anybody." *Id.* at 203. As to the other guidepost, Smith's "words and acts in the light of all the circumstances" largely support his explanations. *Wingfield*, 122 F.3d at 1333 (internal quotation marks omitted). Deputy Haislip testified that Smith could have hit his vehicle if he had wanted to do so. Dkt. 10-2, at 102. Deputy Bannowsky testified Smith "did swerve . . . to avoid [him]." *Id.* at 110. He further testified that his vehicle was stationary when Smith passed him, indicating that Smith could have impacted Deputy Bannowsky's vehicle if he had desired to do so. *Id.* at 105, 109-10. Jordyn Garber testified that Smith swerved to avoid oncoming cars and that he was trying to get away, not harm anyone. *Id.* at 166, 171-72. Trooper Keeling testified that he did not have any evidence that Smith intended to hit his vehicle, other than the fact that Smith was driving into oncoming traffic in Keeling's lane. *Id.* at 159-60. Micha Current similarly testified that he did not have any facts suggesting Smith intended to hit his car and that he did not know whether Smith also took evasive action to prevent a collision. *Id.* at 120. None of the four drivers affirmatively stated a belief that Smith intended to hit their vehicles.

The remaining evidence likewise is susceptible to the interpretation that Smith was driving recklessly to evade his pursuers, not that Smith possessed the intent to hit drivers in oncoming traffic. The record reflects that Smith was travelling in a two-door vehicle at a high rate of speed—

well over 100 miles per hour—throughout the pursuit. *Id.* at 14, 17-18, 20, 160. Any impact between Smith and an oncoming car at that speed would risk bodily harm or death not only to the occupants of the oncoming car, but also to himself and his girlfriend, Jordyn Garber. The impact would also risk disabling or destabilizing his car and ending the pursuit. If the State's theory was that Smith intended to hit the oncoming cars in an attempt to prevent the officer occupants from pursuing him or to create an obstacle that would impede his pursuers, this theory is unlikely in light of the potential detrimental effects to Smith and the evidence that Smith could have impacted at least two of the four cars if that indeed was his intent. *See Smith*, 935 F.3d at 1088 ("[A]n inference must be more than speculation and conjecture to be reasonable." (internal quotation marks omitted)).

The evidence, however, is arguably susceptible to another interpretation. A rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have viewed Smith's act of driving directly toward oncoming vehicles at high speeds as an attempt to cause the oncoming vehicles to crash, thus causing bodily injury. If Smith could cause oncoming vehicles to swerve and crash (whether by loss of control or by hitting Smith's pursuers, who were also traveling at high speeds, or other traffic) without himself hitting the vehicles, he might divert and evade both the oncoming officers and pursuing officers. This interpretation of the evidence is not inconsistent with Smith's explanation that he drove toward oncoming traffic so that his pursuers would "stop chasing him." Dkt. 10-2, at 155. It is also supported by McCutcheon's testimony that Smith "steer[ed] towards" and "swerved at" police and civilian vehicles, as well as the testimony of the four drivers, who each averred that Smith drove toward their vehicles in a manner requiring them to take evasive action. Dkt. 10-2, at 18-19. While both Smith and Garber testified that Smith did not intend to cause bodily harm, a reasonable factfinder might discredit Smith's

testimony as self-serving and Garber's testimony as colored by her personal relationship with Smith. *See Jackson*, 443 U.S. at 319 (explaining that the *Jackson* standard "gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

For these reasons, the Court determines that the OCCA's decision was neither an objectively unreasonable application of *Jackson* nor an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d)(1), (2). The Court finds that fairminded jurists could disagree on the correctness of the OCCA's decision, and this "possibility of fairminded disagreement" precludes habeas relief. *Richter*, 562 U.S. at 102-03; *see Williams*, 529 U.S. at 409-10; *Schriro*, 550 U.S. at 473; *Harrington*, 562 U.S. at 101-03.

C. Ground Three: Ineffective Assistance of Counsel

In his third claim for relief, Smith claims that he received ineffective assistance of trial counsel because counsel failed to argue that the charges of running a roadblock (Count 3) and assault with a dangerous weapon (Counts 5 through 8) arose out of the same act that constituted felony eluding (Count 2), such that he received multiple punishments for one course of criminal conduct in violation of Okla. Stat. tit. 21, § 11. Dkt. 1, at 27-29.

Claims of ineffective assistance of counsel are analyzed under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must first demonstrate that counsel's performance was deficient, which requires a showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The petitioner must then demonstrate that "the deficient performance prejudiced the defense." *Id.* at 687. To establish prejudice, Smith must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at

694.  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted).

The OCCA analyzed Smith's claim under *Strickland* and determined that Smith had shown neither deficient performance nor prejudice:

> In Proposition One it was determined that there was no double punishment violation.  Under a review for ineffective assistance, there is no basis to find that counsel performed deficiently.  Using our case law on double punishment there is no reasonable conclusion that counsel failed to act within an objective standard of reasonableness and that, but for counsel's unreasonable conduct, the result of the proceeding would have been different.

Dkt. 9-4, at 7-8.  Having reviewed the record, the Court agrees with the OCCA's determination that Smith failed to meet the *Strickland* standard.

Under section 11, a criminal act cannot "be punished under more than one section of law; and an acquittal or conviction and sentence under one section of law, bars the prosecution for the same act or omission under any other section of law." Okla. Stat. tit. 21, § 11.  "[P]roper analysis of a Section 11 claim focuses on the relationship between the crimes." *State v. Kistler for Payne Cnty.*, 421 P.3d 899, 900 (Okla. Crim. App. 2017).  "If the crimes truly arise out of one act, Section 11 prohibits prosecution for more than one crime, absent express legislative intent." *Sanders v. State*, 358 P.3d 280, 283 (Okla. Crim. App. 2015).  If, however, the offenses are "separate and distinct, requiring dissimilar proof, Oklahoma's statutory ban on 'double punishment' is not violated." *Id.*  "Section 11 does not bar the charging and conviction of separate crimes which may only tangentially relate to one or more crimes committed during a continuing course of conduct." *Irwin*, 424 P.3d at 676.

As noted by the OCCA in rejecting Smith's double punishment claim, the statute criminalizing running a roadblock, Okla. Stat. tit. 21, § 540B, contains the express legislative intent that willful violation of the statute "shall constitute a separate offense from any other offense

committed." *See* Dkt. 9-4, at 4.   Regarding the four counts of assault with a dangerous weapon, these charges and convictions related to different individuals and required proof of different elements than those underlying the felony eluding offense.  Dkt. 10-4, at 49 (charging Smith with eluding Trooper McCutcheon and Trooper King and with assaulting Deputy Haislip, Deputy Bannowsky, Trooper Keeling, Micha Current, and Tristen Allen with a dangerous weapon); *see* Okla. Stat. tit. 21, §§ 540A(A)-(B), 645.

While felony eluding under § 540A(B) requires proof of eluding "in such manner as to endanger any other person," proof of this element was not contingent on proof that Smith endangered the five individuals whom he was charged with assaulting with his vehicle.  The element of endangerment could be met, as the OCCA held, by Smith's "endanger[ment] [of] his passenger and the troopers who began the pursuit."  Dkt. 9-4, at 5.  Trial testimony further demonstrated endangerment of "a number of vehicles at [an] intersection" where Smith lost control of his vehicle, as well as endangerment of other oncoming police and civilian vehicles.  Dkt. 10-2, at 19 (McCutcheon testimony that Smith came within "five feet from hitting a vehicle head-on" at an intersection where Smith lost control of his vehicle and that Smith "swerved at" four or five police units and four or five civilian vehicles).

Counsel is not ineffective for failing to pursue a meritless argument.  *See Sperry v. McKune*, 445 F.3d 1268, 1275 (10th Cir. 2006).  Accordingly, the Court determines that the OCCA's decision was not contrary to, or an unreasonable application of, *Strickland v. Washington*, nor was it based on an unreasonable determination of the facts in light of the evidence.  28 U.S.C. § 2254(d).

IV. CONCLUSION

Based on the foregoing, the Court denies Smith's petition for a writ of habeas corpus (Dkt.

4). Under Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue only upon "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The Court concludes that the requisite standard has not been met in this case and therefore declines to issue a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. the Clerk of Court shall note on the record the substitution of William Rankins in place of Jimmy Martin as party respondent;

2. the petition for writ of habeas corpus (Dkt. 4) is **denied**; and

3. a certificate of appealability is **denied**.

**DATED** this 29th day of September, 2023.

Ronald A. White
United States District Judge
Eastern District of Oklahoma